In re the ADOPTION OF INFANTS H.

Marion County Division of Indiana Department of Child Services Appellant–Intervenor,

v.

Stephen Melinger, Appellee–Petitioner/Cross–Appellant.

No. 29A02–0611–CV–1018.

Court of Appeals of Indiana.

Dec. 21, 2007.

Barry A. Chambers, Jennifer Hubartt, Indianapolis, IN, Attorneys for Appellant.

Stephen C. Litz, Monrovia, Indiana, Attorney for Appellee.

## OPINION

MAY, Judge.

The Marion County Department of Child Services ("DCS") appeals the adoption granted to Stephen Melinger. DCS raises the following restated issues:

1. The court erroneously granted the adoption without a period of placement and supervision;

2. The court lacked jurisdiction over the children because they were not Indiana residents;

3. The court lacked authority to grant the adoption to a non-resident because the children were not "hard to place" pursuant to Ind.Code § 31–9–2–51; and

4. The court failed to comply with the Interstate Compact on the Placement of Children, Ind.Code ch. 31–28–4.

Melinger raises two issues on cross-appeal:

1. DCS has no standing to appeal because it did not appeal the court's July 18, 2006 entry that ordered DCS's "responsibility for the placement of these children is terminated effective today." (Tr. at 281); and

2. The court erred in denying Melinger's motion to dismiss the CHINS case.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On April 8, 2005, Z.H., an African–American, gave birth to twin girls at Methodist Hospital. The twins were nine weeks premature and were placed in the neo-natal intensive care unit. Z.H. listed Melinger as "Father" on the girls' birth certificates. (Ex. at 16–17.) On April 11, Z.H. and her husband signed an affidavit and consent to adoption that indicated

Z.H. was inseminated with combined sperm from an anonymous donor and Melinger on September 22, 2004; husband was not the father; they did not know who the father was; and they wanted Melinger to adopt the twins.

On April 13, 2005, Melinger filed a petition for adoption in Hamilton Superior Court ("the Adoption Court"). Attached to the petition was the affidavit and consent from Z.H. and her husband. Melinger testified he lived near Methodist Hospital in Indianapolis; Z.H. had given birth to the girls for him from a combination of his and donor sperm; the children were born much earlier than expected; he needed "authority over the children" for insurance coverage, (Tr. at 6); he was in the process of completing a home study; he is a teacher in the Union City, New Jersey, school system; he had never been convicted of a crime; and he had the financial resources to care for the children. The Adoption Court granted Melinger temporary custody of the twins.

On April 29, 2005, the Adoption Court heard additional evidence on Melinger's petition to adopt. Melinger entered a home study prepared by Paralegal On Call, a then-licensed child placement agency. Melinger testified he had been visiting the twins every day; his insurance was covering their hospital bills and he would pay any remaining balance; he was considering moving the children to a New Jersey hospital; he had found both a full-time nanny and a back-up nanny to assist him at home; he wanted to adopt; and he believed it was in the twins' best interests that he adopt them. At the end of the

hearing, the Adoption Court granted Melinger's petition to adopt.

In late April or early May, Melinger unintentionally brought his small pet bird into Methodist Hospital's neonatal intensive care unit.[1] Hospital staff reported this incident to DCS, and based thereon, on May 2, 2005, Marion County Juvenile Court ("the CHINS Court") held a detention hearing and entered an *ex parte* detention order for the twins. That order raises questions about Melinger's residency and whether his adoption complied with the Interstate Compact on the Placement of Children ("ICPC").

On May 4, 2005, back in the Adoption Court, Melinger moved for a *nunc pro tunc* order finding the children were "hard to place" pursuant to Ind.Code § 31–9–2–51.[2] (Appellant's App. 185–86). On May 10, he filed a motion to amend the adoption petition to indicate the children were biracial. In addition, the motion requested correction of the home study to indicate Z.H. was inseminated with a combination of sperm from Melinger and an anonymous donor, rather than from Melinger only. On May 11, the Adoption Court entered a *nunc pro tunc* decree finding the twins were hard to place because of their race, and therefore Melinger's "non-residence status does not preclude the court from granting this adoption." (*Id.* at 181.)

Also on May 11, 2005, DCS filed in the CHINS Court a petition alleging the twins were Children in Need of Services ("CHINS"). The petition specifically alleged:

> Mr. Melinger has demonstrated poor judgment in providing care for his daughters. Mr. Melinger endangered

---

1. Melinger testified he was at the unit to drop off paperwork, he was not there to visit the twins, he remained in the "office" portion of the unit, and he was never near the children with the bird. (Tr. at 122.)

2. "Hard to place children" may be adopted by nonresidents of Indiana. Ind.Code § 31–19–2–3.

his children's health by bringing a live bird into the neonatal intensive care unit on one occasion and by arriving at the neonatal intensive care unit on another occasion with bird feces on his shoulder. These actions risked serious infection to his children and to the other children in the neonatal intensive care unit. Mr. Melinger's interactions with the staff at [Methodist] Hospital have left the hospital with significant concerns about his ability to provide for these children's needs once they are released from [Methodist] [Hospital].

(Ex. A.) The petition also claimed "[c]oncerns for the safety of the children precluded offering services to prevent removal." (*Id.*) That same day, the CHINS court ordered the children to be wards of the DCS, but listed the plan for permanency as "Reunification with parent(s)." (Ex. B.) That Initial Hearing Order also ordered the parties to return June 20, 2005, for a fact-finding hearing and provided:

> The Court, having considered the question of access to these juvenile proceedings, now finds that it is in the best interests of the child or the safety and welfare of the community to deny access, and, therefore, orders that the general public and the media shall not be allowed access to any of the proceedings under this cause, pending further Order of the Court.

(*Id.*)

On July 25, 2005, the guardian ad litem from the CHINS case (hereinafter "CHINS GAL") asked the Adoption Court for access to the adoption file.

On July 26, 2005, the CHINS Court entered an order opening for public inspection the record of proceedings in the twins' CHINS case. That order provided in part:

> In the instant case, there appear to exist significant legal, moral and ethical questions concerning the forthrightness, candor and honesty of those individuals who participated in the adoption process in Hamilton County, Indiana by virtue of which Stephen Melinger claims he is the father of the Twin Infants Melinger, which may call into question the efficacy of such proceedings.

> Ind.Code § 35–46–1–4(d) provides that except for property transferred or received: (1) under a court order made in connection with a proceeding under I.C. 31–15, I.C. 31–16, I.C. 31–17, or I.C. 31–35 (or I.C. 31–1–11.5 or I.C. 31–6–5 before their repeal); or (2) under II.C. [sic] 35–36–1–9(b), a person who transfers or receives any property in consideration for the termination of the care, custody, or control of person's dependent child commits child selling, a Class D felony.

> The Court having considered the applicable statutes, the allegations in the Request for Filing of Petition and For Temporary Custody and/or Supervision, the Preliminary Inquiry and Affidavit, the fact that the children in question are tiny infants who will not be aware of or affected by any controversy or publicity which might result from the court's decision, now finds that the public should not be excluded from proceedings pursuant to Ind.Code § 31–32–6–2.

(Appellant's App. at 171) (formatting altered).

On July 29, 2005, the Adoption Court vacated its adoption decree and the *nunc pro tunc* amendment thereto. On August 1, 2005, the Adoption Court appointed a guardian ad litem to represent the twins' interest in the adoption proceedings (hereinafter "Adoption GAL"). On August 3, 2005, the Adoption Court denied the request of the CHINS GAL for access to the adoption file, finding the GAL failed to attach proof of appointment as guardian ad

litem in the CHINS action and failed to provide citation to authority that would permit full access to the file.

Also on August 3, Melinger filed a motion for change of judge in the CHINS Court based on the bias displayed in statements the CHINS Judge made to the Indianapolis Star for an article on the twins.

On August 12, 2005, the Adoption GAL filed a New Jersey home study with the Adoption Court. August 23, 2005, DCS filed an appearance in the Adoption Court as an interested party, asserting it was the "legal guardian and custodian" of the twins. That day, DCS also filed a petition to intervene in the adoption proceedings pursuant to Trial Rule 24 and a motion to set aside Melinger's adoption of the twins because:

1. MCDCS (formerly known as MCOFC) has been involved with the above named children since April 20, 2005. On or about that date, MCDCS received a report of child abuse and/or neglect regarding the above named children and initiated its investigation. Stephen Melinger was aware of this investigation prior to the finalization of this adoption with this Court on or about April 29, 2005, yet the "Adoption Summary" Melinger submitted to this Court in support of his Petition specifically indicates that he had no previous contact with Child Protective Services.

2. Stephen Melinger was a resident of the state of New Jersey at the time the children were born in Indianapolis, Indiana on April 8, 2005. Stephen Melinger was a resident of the state of New Jersey at the time his "Adoption Summary" submitted in this action was prepared on April 27, 2005. Stephen Melinger was a resident of the state of New Jersey at the time the adoption was finalized on April 29, 2005. Stephen

Melinger is currently a resident of the state of New Jersey.

3. Indiana Code 31–19–1–1 states that the adoption of a child born in one state by a person in another state is subject to the Interstate Compact on the Placement of Children. Prior to the finalization of this adoption, there was no effort made by Mr. Melinger to comply with I.C. 31–19 et seq. with regards to the Interstate Compact. Such compliance was a condition precedent to the finalization of this adoption.

4. The biological parents of these children are unknown. I.C. 31–19 et seq. makes clear and specific provisions regarding the notification procedures which must be followed with regards to biological parents of a child who is the subject of an adoption petition. Mr. Melinger failed to follow through with all statutory notice requirements regarding biological parents prior to the finalization of this adoption.

5. Stephen Melinger failed to follow clear statutory requirements and failed to provide this Court with complete and accurate information prior to the finalization of his Petition for Adoption regarding the above named children.

(Appellant's App. at 139–40.) The Adoption GAL objected to intervention of DCS based on Adoption GAL's belief that DCS failed to keep the CHINS file confidential. After a hearing, the Adoption Court granted DCS's petition to intervene on August 31, 2005, but explicitly ordered all matters related to the adoption proceedings be kept strictly confidential.

On August 31, the CHINS GAL again requested access to the Adoption file. The Adoption court denied that request because the CHINS GAL did not meet the statutory requirements for access.

On November 22, 2005, Melinger filed an amended petition for adoption in which

he asserted the children were hard to place because they were part of a sibling group pursuant to Ind.Code § 31–9–2–51(2). He attached thereto a parenting assessment conducted by The Children's Bureau, a home study conducted in New Jersey, a second consent to adoption by the birth mother, confirmation no putative father registered with the State Department of Health, and proof of publication in Indiana and South Carolina[3] of the anticipated adoption of the twins.

DCS filed notice that it intended to contest the adoption. DCS noted that, because the twins were wards of DCS, Ind. Code § 31–19–9–1[4] required the agency's consent for the adoption.

On January 9, 2006, the Adoption Court held a final hearing on the adoption. At this hearing, it came to light that Z.H. was not the biological mother of the twins; rather an egg from an anonymous donor had been used. Witnesses from Marion County opined the adoption should not be granted because Melinger was too old and did not know how to comfortably interact with premature babies. Witnesses from Hamilton County opined nothing about Melinger should stand in the way of his adoption if the Adoption Court was comfortable allowing any 58–year–old man to adopt twin girls.

On January 19, 2006, the Adoption GAL filed a motion to transfer the CHINS action to the Adoption Court and consolidate the cases. On February 14, 2006, the Adoption GAL filed a report. On March 1, 2006, the Adoption GAL's motion to trans-

fer and consolidate was "submitted and Granted." (Appellant's App. at v.)

On March 1, 2006, the Adoption Court found:

20. The record in this case indicates that incomplete information was provided to the Court on more than one occasion regarding this petition for adoption. This information was in regard to material aspects of the case such as the parentage of the minor children including that the children were born of donor eggs implanted in the surrogate mother. The existence of a surrogacy relationship or its parameters were not disclosed to the Court and an affidavit of financial disclosure signed by the birth mother was never filed or approved by the Court. The $15,000 surrogacy fee was never disclosed to the Court until the filing of the Guardian Ad Litem's report. This lack of candor and mass confusion of crucial factors concerns the Court.

21. Much ado has been made of the existence of a surrogacy arrangement in this case. Surrogacy or the appropriateness of surrogacy arrangements was never an issue in this case. This case is not about enforcing a surrogacy contract. The Court's decision should not be seen or interpreted in that light. This is a case AFTER the surrogacy arrangement has been completed. The contract was completed when the birth mother signed her consent to adoption. Thus this decision should not be interpreted or construed as favorable to or against surrogacy.

---

**3.** Z.H. and her husband lived in South Carolina.

**4.** The pertinent portion of that statute provides:

Except as otherwise provided in this chapter, a petition to adopt a child who is less than eighteen (18) years of age may be

granted only if written consent to adoption has been executed by the following: ... (3) Each person, agency, or county office of family and children having lawful custody of the child whose adoption is being sought. Ind.Code § 31–19–9–1(a)(3).

22. Concerns have been raised that the Petitioner was not a "resident" of the State of Indiana at the filing of the petition. That is not the evidence presented then or now. At the time of the filing he was living full time in Indianapolis, Indiana. The evidence was also clear that there was a future intent to return to New Jersey at an undetermined date when the infants were ready to be released from the hospital. Thus residency as defined by case law—a present intention to remain—was met at the original filing and the evidence presented supported a finding that Stephen Melinger was a resident of Indiana.

23. The record is also clear that Mr. Melinger had a job, a home and extensive ties in the State of New Jersey and that he intended to resume his life once the [twins] were released from the hospital. If one considers that to mean that he was a New Jersey resident, a finding which this court does not concede, then this court still had jurisdiction to decide this adoption because the [twins] were found to be hard to place infants. On the date of the filing of the petition these [twins] were medically compromised, were of a sibling group that should be placed together, and were believed to be biracial. The issue of biracial parentage is now more difficult to determine, but the other two grounds for a finding of "hard to place" still exist. This Court therefore had jurisdiction even if the Petitioner is considered a New Jersey resident.

24. Extensive investigations have been performed in this case. [CHINS GAL] has conducted an investigation including arranging for a New Jersey Home study pursuant to the "Interstate Compact". This court has seen this study prepared by Cari Curasco and has had [the Adoption GAL] confer with Ms[.] Curasco. This study indicates there is no impediment to adoption by Mr[.] Melinger. The Court has seen the home study prepared by Paralegal On Call, Inc[.] which recommends the adoption proceed. The Court notes that there are some significant errors in said report but finds no indication that there are causes for concern raised therein. A 19 page Parenting Assessment was completed at the request of ... the [DCS] during the CHINS action which was described by the attorney for the [CHINS GAL] as "pretty positive" (see Hamilton County GAL report.)[.]

25. At the final hearing herein, the [CHINS GAL] testified at length about her interactions with Mr[.] Melinger. In general she described Mr[.] Melinger as hesitant and unsure in his initial interactions with the twins. The [CHINS GAL] has also shared with the [Adoption GAL] that in her observation this situation may have improved a bit as the children became older. The [CHINS GAL] described Mr. Melinger as a gentle person who was earnest and well intended, but she opined that she was not aware of any real natural instincts he possessed. (See Hamilton County GAL report.)[.]

26. The [CHINS GAL] also reported that she had been advised that the Marion County foster family had indicated an interest in adopting the twins very early in placement. So early in fact as to set her on edge a bit. The [CHINS GAL] also opined that while she would want to spend more time with the foster family if they were to adopt the girls, she had witnessed conduct by the foster mother and her manner of feeding the girls which caused her concern during her contact with the foster family.

27. The DCS caseworker assigned to the CHINS case also testified at trial. She testified to no specific facts which

would indicate that the Petitioner was not a suitable parent or any basis for this Court to find that the adoption was not in the best interest of the minor children. She did share the concern of the [GAL] that the Petitioner was 58 years of age and she would have liked yet to have a "bonding assessment" of the bond between the Petitioner and the minor children. It was unclear why such an assessment had not been done earlier and further unclear whether such an assessment would provide any useful information now some 8 months after the forced separation of the Petitioner and the twins. Finally the impact of her insights were [sic] severely diminished by the very long period of time between her last visit with the minor children and the trial herein.

28. The [Adoption GAL] conducted an extensive investigation in this case including a trip to the home of the Petitioner during which she interviewed employers and others with direct knowledge of his day to day living arrangements in New Jersey. The [Adoption GAL] set forth her conclusions at trial and in her written report. That report concludes that there are concerns as to the Petitioner's future abilities as a parent to do things like: providing proper boundaries and consequences for the [twins'] behaviors; providing adequate female influences and mentors to assist the [twins] as they mature; and being too old to keep up with the [twins] and provide supervision later in life. These are all valid concerns in any adoption and there are no guarantees as to the conduct of any parent in the future. The Court is unwilling to determine that this Petitioner is unable to provide those needs based on the paucity of real evidence to support those conclusions. The Court notes that a major obstacle has occurred to block a better determination of these issues. The State in the CHINS case has detained the twins and hampered the relationship between Mr[.] Melinger and the twins so that there could not be evidence of his ability to adapt. The Court can not hold that paucity of evidence against the Petitioner under these circumstances; however, a post placement period of supervision is clearly appropriate to insure that adequate evidence is available.

29. The Court finds that it is in the best interest of the minor children that this adoption proceed. Because of the hard to place nature of the children at the time of filing and because of the residence claimed by the Petitioner at filing and the initial hearings this Court has jurisdiction.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the a[sic] period of post placement supervision of the minor children should occur prior to the entry of a final decree of adoption. That period shall be for a period of six months and reports shall be made of the status of the placement on the 30 day [sic], the 90th day and the 180th day after the date of actual custody being placed with Mr[.] Melinger. The [Adoption GAL] shall coordinate the filing of those reports. Upon completion of 180 days subject to acceptable post placement reports a final decree shall be entered herein.

(*Id.* at 54–59.)

On March 9, 2006, the Adoption Court received notice the CHINS Court had transferred the CHINS proceeding to the Adoption Court. On March 10, 2006, Melinger filed a motion to dismiss the CHINS proceeding.

On May 19, 2006, the Adoption GAL filed a motion to release the documents

necessary for an adoption agency in New Jersey to conduct post-placement supervision. On May 23rd, that motion was granted. On June 27, 2006, the Adoption GAL filed her first and second post-placement reports.

On July 13, 2006, DCS filed an updated case plan for the twins. This was the first case plan received by the Adoption Court.

On July 18, 2006, the Adoption Court held a hearing on Melinger's motion to dismiss the CHINS action. The CCS entry for that hearing indicated:

> Argument heard on Petitioner's Motion to Dismiss CHINS Action. The Court orders for clarity purposes that as of this date that [sic] Marion County Office of Family and Children is no longer responsible for the custody of the minor children in the CHINS case. There is no effective detention order in place. Guardian Ad Litem is requested to retain private adoption agency in New Jersey to complete home study prior to deadline for the adoption termination of September 1, 2006.

(Id. at vi.)

On July 19, 2006, the Adoption Court received a Case Management Plan from DCS. On August 4, 2006, DCS submitted to the Adoption Court all the "previously prepared case plans in this matter." (*Id.*)

On September 16, 2006, Golden Cradle Adoption Services, a New Jersey adoption agency, filed its post-placement report. The Adoption Court, on its own motion, set the case for final hearing on October 11, 2006. On October 17, 2006, the court entered the following order:

> Comes now petitioner Stephen Melinger by counsel, and files his "Verified Petition for Adoption" as well as his amended petition for adoption. The Court, having heard the evidence thereon, and having received and reviewed the investigation and recommendations from Paralegal–On–Call, a licensed child placing agency at the time said report was submitted, Golden Cradle Adoption Services, a licensed New Jersey child placing agency, the Children's Bureau, Inc., as well as the New Jersey Family and Social Services Division, and having received evidence from the Hamilton County guardian *ad litem*, and petitioner appearing by counsel in open court and requesting the court to grant said adoption, the Court finds that petitioner has sufficient ability to care for said children and furnish suitable support and education for said children, and has been doing so pursuant to this court's post-placement order of March 1, 2006. The Court also finds that the children are hard-to-place, as defined by I.C. 31–9–2–51(2). The Court further finds that because, contemporaneously with this order, it has dismissed the related CHINS case, Marion County Division of Children's Services' (DCS) consent is not necessary for this adoption. Alternatively, to the extent that it is determined that DCS' consent is necessary for this adoption, the Court finds that pursuant to I.C. 31–19–9–8(a)(10), DCS' refusal to consent to the adoption is not in the children's best interest, has been unreasonably withheld, and their [sic] consent is therefore deemed not required. The Court further finds [the children] shall be entitled to receive all rights and interests in the estates of the petitioner by descent or otherwise, which they would be entitled to if they had been the natural children of the petitioner. The Court further finds that petitioner has paid the costs of this matter. **It is therefore ordered, adjudged, and decreed** that the above-entitled petition for the adoption of said infants is hereby GRANTED, and that said children shall for all intents and purposes

be considered the natural children of petitioner. The court hereby DISMISSES the pending CHINS case, transferred from Marion Circuit Court. . . .

(Appellant's Br. at 30–31.)

## DISCUSSION AND DECISION

We address Melinger's issues first because, if one of them is dispositive, we are relieved of our obligation to address DCS's arguments on appeal.

### A. Melinger's Issues

#### 1. Waiver of Right to Appeal

■ Melinger argues DCS waived its right to appeal by failing to appeal within thirty days of the Adoption Court's July 18, 2006 hearing on Melinger's motion to dismiss DCS. During that hearing, the judge said, "Okay [DCS]'s responsibility for the placement of these children is terminated effective today." (Tr. at 281.) Melinger asserts that statement constituted a "final order" from which DCS was required to appeal. We cannot agree.

Appellate Rule 2(H) provides:

A judgment is a final judgment if:

(1) it disposes of all claims as to all parties;

(2) the trial court in writing expressly determines under Trial Rule 54(B) or Trial Rule 56(C) that there is no just reason for delay and in writing expressly directs the entry of judgment (i) under Trial Rule 54(B) as to fewer than all the claims or parties, or (ii) under Trial Rule 56(C) as to fewer than all the issues, claims or parties;

(3) it is deemed final under Trial Rule 60(C);

(4) it is a ruling on either a mandatory or permissive Motion to Correct Error

which was timely filed under Trial Rule 59 or Criminal Rule 16; or

(5) it is otherwise deemed final by law.

Melinger directs us to no written order of the Adoption Court, nor have we found one, expressly determining that order is a final judgment as to some parties, claims, or issues and entering judgment thereon under Trial Rule 54(B) or Trial Rule 56(C). See App. R. 2(H)(2). Neither has he directed us to statutory or other law deeming this order a final judgment.[5] See App. R. 2(H)(5). The order was not a ruling on a Trial Rule 60 motion for relief from judgment, and thus could not be "deemed final under Trial Rule 60(C)." App. R. 2(H)(3). Neither was it a ruling on a Trial Rule 59 Motion to Correct Error, which could be appealed under Appellate Rule 2(H)(4).

Nor can we hold the judgment "disposed of all claims as to all parties." See App. R. 2(H)(1). After making the statement Melinger describes as a "final judgment," the judge said:

I have intentionally not dismissed the CHINS case today. Maybe you didn't catch that in my ruling. I absolved [DCS] from further responsibility because frankly I need to get your dilatory client out of the way so I can get done what I need to get done and make a final decision in this case in the 180 days that I have. You are still a party, however and you will still receive notifications and if we do not get approval for adoption that means you are in a position to come back in and seek another detention order and at that point in time we can reinstitute where we are.

(Id. at 283.) He further explained:

[O]ne of the reasons that DCS is still in this case is so that you will get to see

---

5. Melinger cited Ind.Code § 31–34–4–2(b)(2) and Ind.Code § 31–34–9–1(2); however, neither of those sections governs when an order is deemed a final judgment.

the report and the same requirements of confidentiality so that you'll know what's happening in New Jersey just as all the rest of us need to know what happens in New Jersey, okay?

(*Id.* at 287–88.)

Those statements limit the scope of the trial court's previous statement in such a way that we cannot find the court either dismissed the CHINS proceeding or removed DCS as a party in the adoption proceedings. *See Schriber v. Anonymous,* 848 N.E.2d 1061, 1064 (Ind.2006) (where court found defendant doctor was a qualified healthcare provider under the Medical Malpractice Act, but refused to take further action until administrative proceedings were completed, its order did not dismiss all claims as to all parties such that the order could be considered final under App. R. 2(H)). Accordingly, the judge's statement at the July 2006 Hearing did not dispose "of all claims as to all parties" and, therefore, was not a final judgment under App. R. 2(H). *See id.*

### 2. *Motion to Dismiss*

■ Melinger next argues the Adoption Court erred when it denied his motion to dismiss "the CHINS case." (Appellee's App. at 62.) DCS alleges Melinger's argument is "without merit [because it] is made in regard to negotiations and discussions held in the CHINS case." (Appellant's Reply Br. at 3.)

Assuming for the sake of argument we found error in the Adoption Court's failure to dismiss the CHINS case, our finding would have no practical impact at this point in the proceedings. Melinger has not argued, much less cited authority suggesting, we could retroactively strip DCS of its status as party to the adoption proceedings when no such motion was made or considered by the Adoption Court. Accordingly, even if we reverse the denial of Melinger's motion to dismiss, DCS would still be a party to this appeal of the adoption and would still have a right to file its brief challenging the Adoption Court's final adoption order.

### B. *DCS's Issues*

#### 1. *Placement and Supervision*

As best we can tell, DCS believes the Adoption Court should have recognized Melinger was a non-resident at the hearings in April of 2005 and, having so recognized, should have required "compliance with Ind.Code § 31–19–2–3, the statute governing nonresident adoptions." [6] (Appellant's Br. at 16.) In addition, it argues the Adoption Court should not have "approved the adoption without the period of placement and supervision as required by Ind.Code § 31–19–8–2." [7] (*Id.* at 14.)

The record indicates there was a period of supervised placement before entry of

---

**6.** In pertinent part, Ind.Code § 31–19–2–3 provides, "An individual who is not a resident of Indiana and who seeks to adopt a hard to place child may file a petition for adoption...." Accordingly, in Indiana, non-residents are permitted to adopt only "hard to place" children.

**7.** Ind.Code § 31–19–8–2 gives trial courts discretion regarding the length and timing of the supervision period. The requirement of a period of supervised placement is found in Ind. Code § 31–19–2–1, which provides in part:

"An adoption may be granted in Indiana only after ... a period of supervision ... by a licensed child placing agency or the county office of family and children...."

The tone of DCS's argument suggests it is challenging the initial adoption decree entered on April 29, 2005—prior to a period of supervised placement and without a finding the twins were hard to place. As the Adoption Court vacated that decree on its own motion on July 25, 2005, any error that may have occurred in its granting is now moot.

the final adoption decree on October 17, 2006. In that final decree, the court found "the children are hard-to-place, as defined by I.C. 31–9–2–51(2)," which brings the adoption into compliance with Ind.Code § 31–19–2–3. Accordingly, we find no merit in this argument.

### 2. *Twins' Residency*

■ DCS next alleges the Adoption Court did not have jurisdiction to grant the adoption because the twins were not residents of Indiana.[8]

> The issue of subject matter jurisdiction is resolved by determining whether the claim involved falls within the general scope of authority conferred on the court by the Indiana Constitution or by statute. When courts lack subject matter jurisdiction, their actions are void *ab initio* and may be attacked at any time.

*Kondamuri v. Kondamuri*, 799 N.E.2d 1153, 1156–57 (Ind.Ct.App.2003) (internal citations and footnote omitted), *trans. denied* 812 N.E.2d 799 (Ind.2004).

■ Personal jurisdiction is a court's "power to bring a person into its adjudicative process and render a valid judgment over the person." *Brockman v. Kravic*, 779 N.E.2d 1250, 1254 (Ind.Ct.App.2002). If a party submits to the jurisdiction of the trial court without challenging the court's jurisdiction over his or her person, then any allegation of error is waived. *Thomison v. IK Indy, Inc.*, 858 N.E.2d 1052, 1055 (Ind.Ct.App.2006).

DCS has not alleged the Adoption Court was not a probate court in Hamilton County. Accordingly, the Adoption Court had subject matter jurisdiction over adoptions pursuant to Ind.Code art. 31–19. *See, e.g.,* Ind.Code §§ 31–19–1–2, 31–19–2–1, 31–19–2–2, 31–19–2–3 (addressing probate court jurisdiction over adoptions).

At trial, DCS did not argue the Adoption Court lacked jurisdiction over the twins or their adoption. Therefore, this issue has been waived for our review.

### 3. *Status as "Hard to Place"*

DCS alleges Melinger was a non-resident who could not adopt the twins because they were not "hard to place." A non-resident may adopt only "a hard to place child." Ind.Code § 31–19–2–3 ("An individual who is not a resident of Indiana and who seeks to adopt a hard to place child may file a petition for adoption. . . ."). Children are "hard to place" if they are

> disadvantaged:
> (1) because of
>    (A) ethnic background;
>    (B) race;
>    (C) color;
>    (D) language;
>    (E) physical, mental, or medical disability; or
>    (F) age; or
> (2) because the child or children are members of a sibling group that should be placed in the same home.

Ind.Code § 31–9–2–51.

■ In its final order, the Adoption Court found the children were hard to place as a "sibling group." DCS alleges the twins were not a "sibling group" for purposes of Ind.Code § 31–9–2–51 because one of them was not over the age of two years when the adoption was granted.[9]

---

**8.** Later in its brief, DCS asserts "Indiana retains jurisdiction over the Children because of the ICPC and the adoption statutes and it is within the jurisdiction of an Indiana Court to order the Children returned to Indiana."

(Appellant's Br. at 27.) DCS does not acknowledge or explain its inconsistent positions regarding jurisdiction over the twins.

**9.** DCS's argument is based on a definition found in the Indiana Adoption Assistance Pro-

The interpretation of a statute is an issue of law that we review *de novo* on appeal. *Porter Development, LLC v. First Nat'l. Bank of Valparaiso,* ·866 N.E.2d 775, 778 (Ind.2007).

> In the interpretation of statutes, our goal is to determine and give effect to the intent of the legislature in promulgating it. Our primary resource for this determination is the language used by the legislature, and thus our interpretation begins with an examination of the statute's language. We presume that the words of an enactment were selected and employed to express their common and ordinary meanings. Where the statute is unambiguous, the Court will read each word and phrase in this plain, ordinary, and usual sense, without having to resort to rules of construction to decipher meanings.

*Id.* (internal citations omitted).

■ We decline to add into the legislature's unambiguous statute a requirement that one of the siblings be over two years of age. *See id.* As a factual matter, we find remarkable DCS's allegation the twins are not "a sibling group that should be placed in the same home." Ind.Code § 31–9–2–51. Twins are a sibling group from birth. A "sibling" is "one of two or more individuals having one or both parents in common; a brother or sister." (*The American Heritage Stedman's Medi-*cal *Dictionary).* Houghton Mifflin Company. *http://dictionary.reference.com/ browse/sibling* (accessed Nov. 21, 2007). We presume the legislature intended to foster the sibling relationship regardless of whether the siblings have reached two years of age.

### 4. Compliance with ICPC

■ Finally, DCS argues the court should not have granted the adoption without first obtaining full compliance with the Interstate Compact on the Placement of Children ("ICPC"). *See* Ind.Code ch. 31–28–4. As DCS invited any error in that regard, we cannot reverse.

■ Invited errors are errors committed or invited by a party or that are the natural consequence of a party's own neglect or misconduct. *Batterman v. Bender,* 809 N.E.2d 410, 412 (Ind.Ct.App.2004). A party that invites error may not take advantage of such alleged error. *Id.* Therefore, we do not review such allegations from the party who invited the alleged error. *Id.*

In *Batterman,* an ex-husband filed a motion in Indiana to modify a child support order from Wisconsin. For an Indiana court to have jurisdiction to modify the order, ex-husband needed to properly register the order in Indiana. At the hearing, ex-husband's counsel acknowl-

---

gram, which provides financial incentives for adoption of hard to place children. *See* Ind. Code § 31–19–27–1 (DCS "shall carry out a program to place hard to place children in suitable adoptive homes...."); *See also* 465 IAC 2–7. One type of special needs child eligible for the financial incentives is "a member of a sibling group of two (2) or more children of which at least one (1) is two (2) years of age or older and who will be placed with the sibling group in the home." 465 IAC 2–7–2(2)(B).

DCS invites us to give the phrase "sibling group" in Ind.Code § 31–9–2–51 the same definition the IAC gives to sibling group for special needs funding, in order to create a "harmonious system of legislation." (Appellant's Br. at 21.) We decline the invitation. When siblings are all under the age of two, they are a sibling group that is "hard to place," Ind.Code § 31–9–2–51, even if they are not "special needs children" for whom financial assistance is available. When, on the other hand, one member of a group of siblings is over the age of two, the group would be both "hard to place," Ind.Code § 31–9–2–51, and "special needs children" for whom financial assistance is available.

edged "his obligation to register the judgment." *Id.* at 413. In addition, the court ordered ex-husband to promptly register the order in Indiana. Nevertheless, ex-husband failed to register the order. Then, on appeal, he challenged the trial court's jurisdiction to modify his support because the Wisconsin order had not been registered in Indiana. We declined to address his allegation regarding subject matter jurisdiction because "the filing of the Wisconsin order was entirely in the hands of [ex-husband], and any problem with the registration of the order is directly attributable to him." *Id.*

The record before us suggests DCS was in control of whether the trial court could comply with the ICPC; DCS, therefore, is responsible for any error in the trial court's failure to comply with the ICPC.

In March of 2006, the Adoption Court entered the provisional order requiring six months of post-placement supervision in New Jersey. (*See* Appellant's App. at 59.) In July of 2006, the Adoption Court held a hearing on Melinger's motion to dismiss. At that hearing, Judge Hughes addressed DCS's failure to facilitate compliance with the ICPC:

> I've got [the Adoption GAL] telling me that what we all agreed we would do, which was get an interstate compact done cannot be done because [DCS] has not filed, followed through with the paperwork and they are the ones who have to do it. I want permanency for these children. I want post placement supervision. It's now being absolutely thrown out the window by bureaucratic paperwork snafus, so I want to know what the plan is, exactly what [DCS is] going to do and I want it on my record so I know.
>
> \*    \*    \*    \*    \*    \*
>
> ... I reposed the supervision of this child [sic] and the responsibility to the New Jersey authorities who will not do it because [DCS] is involved and won't do the paperwork and [the Adoption GAL] is going [on visits to New Jersey] because nobody can go because [DCS] won't get off [its] duff.
>
> \*    \*    \*    \*    \*    \*
>
> Clearly [DCS] wants to be involved in what happens with these children and I want [DCS] to know what happens with these children and I would rather they have first hand, absolutely, correct information as opposed to the supposition and wild allegations that occurred earlier without information. So that's why we're all together, but I can't get it done unless [DCS] cooperates and it looks to me like they're not cooperating. I can get it done easily. I can dismiss the CHINS case and once [DCS] is no longer involved, we get post placement supervision by New Jersey. I don't really want to do that. How can I get it done?
>
> \*    \*    \*    \*    \*    \*
>
> [W]e've never adjudicated the CHINS case because it was going to be dismissed when we adjudicated the adoption case. That was what everybody came and agreed and now that's not happened.
>
> \*    \*    \*    \*    \*    \*
>
> My order [was] based upon the agreement that we all had that [DCS] was going to bow out and allow supervision in New Jersey and I was going to delay the adoption until post placement supervision and interstate compact was done. We are now how many months down the road and there has been no interstate compact work completed. New Jersey will not become involved because [DCS] is still involved. That's where we are....
>
> \*    \*    \*    \*    \*    \*

I don't understand that argument that you [counsel for DCS] just made. Have I not communicated effectively in our last three or four contacts exactly where it is I expected it to go? It's my understanding that you and I understood but that perhaps others in your agency didn't, but I didn't think you and I had a problem with understanding. I wanted the interstate compact done. And I want a New Jersey post placement done. Because although I believe you can still make a finding based upon the record and In RE Bayh [sic] that Mr. Melinger was in fact a resident of this state, I don't think that's the appropriate way that it should have gone down and that's why we're w[h]ere we are.

\* \* \* \* \* \*

Now how am I going to get supervision of this family and get it done[?] My deadline is one month and twelve days, thirteen days, from today's date for the final report. September 1. How do we get it done [Adoption GAL]?

(Tr. at 268–82.) [10]

DCS did not timely facilitate compliance with the ICPC, and for that reason the trial court could not fulfill that statutory

requirement. DCS cannot now be heard to complain about the trial court's non-compliance. *See Batterman*, 809 N.E.2d at 413. For all these reasons, we affirm the judgment of the trial court.

Affirmed.

BAILEY, J., and SHARPNACK, J., concur.

---

10. The Adoption GAL reported she could not "get it done through ICPC," (*id.* at 282), but she had contacted a licensed child placement agency in New Jersey that would be immediately available to begin making supervision reports. The trial court elected to use Golden Cradle Adoption Services, which is a private, not-for-profit, licensed agency in New Jersey. *See* http://www.goldencradle.org/about.htm (last visited November 16, 2007).

We note the New Jersey authorities would not cooperate without DCS facilitation, but they were aware of Melinger's intention to adopt the twins. The record contains a July 2005 report by Cari Ann Curasco, who met twice with Melinger in New Jersey and found he, his home, and his nannies were adequately prepared and appropriate for the twins. (*See* Appellee's App. at 58–60.) After Curasco's signature she placed the letters "FSST," (*id.* at 60), and her report indicates Melinger

had no prior or current "DYFS Involvement." (*Id.* at 58.) The website of New Jersey's Department of Children and Families indicates DYFS is the "Division of Youth and Family Services," which "is New Jersey's child protection and child welfare agency." *About the Division of Youth and Family Services*, found at http://www.state.nj.us/dcf/divisions/dyfs (last visited Nov. 13, 2007). The "FSST" presumably indicates Curasco is a "Family Service Specialist Trainee," which is the employee within the DYFS who "perform[s] field and office work involving collecting, analyzing, and recording significant facts" regarding child abuse or neglect referrals, requests for child welfare services, in-home visits, and residential or foster care placements. *Join the DYFS Team—Help Protect New Jersey's Children*, found at http://www.state.nj.us/dcf/about/employment/dyfs (last visited Nov. 13, 2007).